**CONTINENTAL–WIRT ELECTRONICS CORPORATION, a Pennsylvania corporation, Plaintiff,**

v.

**SPRAGUE ELECTRIC COMPANY, a Massachusetts corporation, Defendant.**

Civ. A. No. 43743.

United States District Court, E. D. Pennsylvania.

June 30, 1971.

Thomas J. Mullaney, Philadelphia, Pa., for plaintiff.

Arthur G. Connolly, Jr., Wilmington, Del., for defendant.

ADJUDICATION

DITTER, District Judge.

This suit is brought for damages resulting from breach of an alleged contract to buy an industrial machine. In defense of the claim it is asserted that purchaser's employee lacked authority to make such a contract, matters never got beyond the negotiation stage, and if there was any agreement, its enforcement would be barred by the statute of frauds.

For a period of years prior to the institution of this suit, plaintiff, Continental Wirt Electronics Corporation, supplied defendant, Sprague Electric Company, with carbon rings which were used in the manufacture of certain electrical equipment. In the normal course of business, defendant would purchase the carbon rings from plaintiff by sending a purchase order designating the material desired, the quantity, and the price. However, when the pressure of time required, orders as high as $5000. would be placed verbally over the telephone and subsequent to that a "confirming purchase order" would be sent to plaintiff. On January 19, 1966, Burton S. Lifson, executive vice president of plaintiff, wrote to Roger Kerouac, materials manager of defendant, explaining that plaintiff found it necessary to terminate its manufacturing of these carbon rings. Lifson stated, however, that Continental would not start to dismantle the production equipment until Sprague's current anticipated requirements for the carbon rings had been met.

In response to Continental's letter, Kerouac wrote Lifson asking, among other things, whether Continental would consider selling the equipment necessary to make the carbon rings. On February 16, 1966, Lifson replied to Kerouac that Continental would be willing to sell the equipment and would supply the technical information necessary to establish a manufacturing procedure for Sprague. Ten days later Kerouac requested an itemized list of the equipment involved,

its price, and some idea of the complexity of the operation.

On March 4, 1966, Lifson answered Kerouac explaining that defendant could purchase the machinery, a formalized manufacturing procedure, instruction in the manufacturing of the rings, and availability of plaintiff's work foreman for a reasonable time for $20,000.

On April 1, 1966, Kerouac sent John Logan, an engineer employed by defendant, to plaintiff's plant for a day's observance of the work and processes involved in producing the carbon rings.

On Monday, April 11, 1966, Kerouac called Lifson in Philadelphia and told him that Sprague had decided to buy the equipment, that a purchase order would be forwarded, and that the call was being made in advance because Kerouac knew of Continental's desire to have the equipment removed from its plant. They then reviewed the terms and conditions of the order as contained in the letter of March 4, 1966. Immediately after this telephone conversation, Lifson informed Kalman Lifson, vice president, and William O'Shea, vice president of manufacturing, that the machine had just been sold to Sprague.

On April 18, 1966, Lifson again wrote Kerouac as follows:

This will confirm our telephone conversation of Monday, April 11, concerning the equipment that we have for the manufacturing of carbon rings that we furnish you.

We understand that you are now processing your purchase order to cover the material and equipment as described in our letter of March 4, 1966, and consistent with that letter.

We appreciate your calling us in advance of your order, in as much as this has allowed us to plan in the direction that permits us to sell the equipment to you. We would presume that your confirming order will follow shortly.

The next day, Kerouac wrote to Lifson:

On April 11, I had advised you that we were definitely interested in purchasing the equipment with which to make carbon rings. My advice to you was based on the best information available from our upper management people.

Since that time, I have been advised that there has been a reversal in their original thoughts, and that the decision has been made that we will try to get along without this equipment.

Please accept my most sincere apology, and please consider this letter as final disposition of the entire matter.

I am quite obviously somewhat embarrassed about the entire situation, and I sincerely hope that our tactics have not created any unreasonable problems for you.

Thank you for all of your past favors and again, please accept my most humble apologies.

None of the above facts are in dispute except those pertaining to the telephone conversation of April 11, 1966. Defendant contends that this call was made by Kerouac only to express Sprague's continuing interest in the equipment. I conclude that there would have been no reason for Kerouac to make the telephone call for that purpose, especially since negotiations had been going on for almost four months. Burton Lifson, on the other hand, testified that Kerouac placed the call, told him that Sprague had decided to buy the equipment, and that Sprague's purchase order was being forwarded.

I find that all matters of credibility arising between Kerouac and Lifson should be resolved in favor of Lifson. Accordingly, I accept his statement of the facts pertaining to this telephone call.

My initial determination must be what law applies. A federal court in a diversity case must apply the conflict laws of the state in which it is sitting. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed.

1477 (1941). Pennsylvania follows the modern approach and looks to the law of the place with the most significant relationship to the parties and the transaction, on each issue, or the "center of gravity" of the contract: Griffith v. United Airlines, Inc., 416 Pa. 1, 203 A. 2d 796 (1964), Neville Chemical Company v. Union Carbide Corporation, 422 F.2d 1205, 1210–1211 (3d Cir. 1970). However, under *Griffith*, reliance by the parties on the law of a particular state is also a consideration in making a choice of law:[1] See *Neville*, supra. It is reasonable to believe that the parties here contemplated the application of Pennsylvania law particularly in view of the lack of dispute on this point.

Defendant contends that there are several reasons why there was no contract between it and Continental. The first of these is that Kerouac had no authority to buy equipment for $20,000. and had told Lifson so. It is contended that the only thing that Kerouac had bought from plaintiff on prior occasions was raw materials, and merely because he had authority to purchase raw materials, it does not follow that he had authority to purchase equipment. We disagree.

For more than three years prior to April 11, 1966, Roger Kerouac had dealt with Continental in all matters relating to Sprague's purchases. However, he was not only in charge of procuring carbon rings. When he was advised by Continental that it planned to cease manufacture of these rings, he took charge of the correspondence and telephone conversations respecting Sprague's obtaining the equipment and procedures necessary to begin its own production.

 An admitted agent is presumed to be acting within the scope of his authority where his act is legal and there is no evidence as to any limitations of his authority. In the absence of notice to the contrary, a third person dealing with a known agent may properly assume that he is acting within the scope of his authority. His authority is presumed to be co-extensive with the business entrusted to him and to embrace whatever is necessary or usual in the ordinary course of such business: 3 C.J.S. Agency § 317, p. 256.

 Apparent authority is the power to bind the principal where the principal has not actually granted authority but which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if the principal knowingly permits the agent to exercise such power: Revere Press, Inc. v. Blumberg, 431 Pa. 370, 375, 246 A.2d 407 (1968). It is clear in the instant case that the upper management of Sprague was aware of all of the activities of Roger Kerouac. Marginal notes on the correspondence in question disclose that Kerouac was in constant communication with his superiors. In addition, he actively participated in the negotiations of the carbon ring equipment. Although Kerouac stated at the hearing on February 23, 1971, that he had informed Lifson during the telephone call on April 11, 1966, that senior management's approval would be necessary before a purchase order could be issued, Lifson denied such a statement was made and I have resolved all questions of credibility in favor of Lifson.

 Lifson was asked what his practice was with respect to investigating the authority of purchasing agents with whom he dealt. He answered that he didn't have to ask them about authority. "If they didn't have the authority they wouldn't be calling me, and if I were to ask them about authority, I think they would throw me off their pool vendor list." Lifson had been doing business with Kerouac over the years. He was Lifson's final contact at Sprague; he was the man who made de-

[1] As to questions involving the application of the Uniform Commercial Code, see Section 1–105, 12A P.S. Section 1–105(1) (Supp.1969).

cisions, and the only one with whom Lifson dealt pertaining to the sale of the equipment in question. In light of these facts, I conclude as a matter of law that Roger Kerouac had apparent authority if not real authority to enter into an agreement with Continental for the purchase of the equipment and processes necessary for the production of carbon rings.

■ Defendant's next contention is that there was no "meeting of the minds" and hence there was no contract. Defendant's argument is disposed of by Section 2–311 of the Uniform Commercial Code. That section states:

(1) An agreement for sale which is otherwise sufficiently definite (subsection (3) of Section 2–204) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness.

Section 2–204(3) states:

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

On March 4, 1966, Lifson sent Kerouac a letter which included a list of equipment used in the manufacturing of the carbon rings. It was stated that for $20,000. Continental would sell to Sprague the equipment listed, furnish a formalized manufacturing procedure, and make Continental's work foreman available for a reasonable amount of time to instruct Sprague's employees on the manufacturing of the rings.

Accordingly, there is no question that the parties knew which piece of equipment was involved in the transaction, its selling price, and the basics of what the price included. Under the Code, no more was necessary.

Defendant's next contention is that Lifson's letter of March 4 constituted an

offer which expired by its own terms on April 1. The letter states, "It would appear that by April 1, 1966, we [Continental] will be in a position to realign our equipment and machinery, and would like a decision from you [Sprague] one way or the other before that time."

■ It is clear, however, that the continued dealings of the parties show the offer was extended beyond April 1 even assuming that it was meant to be a deadline. This is evidenced by the fact that on April 1, Roger Kerouac sent John Logan to plaintiff's plant. Logan spent the full working day observing the equipment and interviewing the Continental employees in charge as well as receiving a book on manufacturing procedures for carbon rings. At the conclusion of Logan's visit, Lifson wrote Kerouac stating that Logan had been shown the equipment and had been informed that Continental must have a decision one way or the other from Sprague promptly. (It must be noted here that this lends credence to Lifson's testimony concerning Kerouac's telephone call of April 11). Even if April 1, had been a deadline, the continued dealings of the parties show it was extended by mutual consent.

Defendant's last contention is that if in fact there was a contract, it was violative of the statute of frauds. Section 2–201 of the Uniform Commercial Code provides that contracts for the sale of goods in excess of $500. are not enforceable unless there is some sufficient writing signed by the party against whom enforcement is sought. It is true that in the instant case Continental had no contract which had been signed by Sprague. However, Section 2–201(2) states:

Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such

party unless written notice of objection to its contents is given within ten days after it is received.

■ Plaintiff's letter of April 18, 1966, was a sufficient confirmation in writing as required by that section.[2] In order for the defendant to have repudiated the contract successfully, it would have been necessary for Sprague to have written an objection in response to that confirmation. This was not done. Kerouac's letter of April 19, 1966, was dictated *prior* to receipt of Lifson's letter of April 18. It was therefore not a written notice of objection to Lifson's letter given within ten days. The Commercial Code is explicit. It does not provide for the rejection of an oral contract as such, but sets forth a way to object to a written confirmation of an oral contract and by doing so, to secure the protection of the statute of frauds. This particular section, 2–201, is entitled "Formal Requirements; Statute of Frauds." Something less than formal compliance with its requirements was not intended to obtain its benefits.

Even a less legalistic approach does not change the result. Kerouac's letter is not a disaffirmance of an oral contract but an apology for any unreasonable problems that defendant's conduct caused plaintiff. It states that Sprague was definitely interested and by inference indicates that Lifson had been told Sprague wanted the equipment because Kerouac refers to a "reversal" in the original thoughts of his superiors. The equivocal statement, "we will try to get along without this equipment," followed by an apology and the request, "please consider this letter as final disposition of the entire matter" does not constitute a renunciation of an agreement to purchase.

Defendant's contention that its letter of April 19 was a rejection of any contract which may have been entered into as a result of the April 11 telephone conversation is clearly without merit. Section 2–201(2) deals solely with written confirmations and written notices of objection.

Accordingly, although the transaction was an oral agreement involving the sale of goods in excess of $500., I conclude that the statute of frauds is not available as a defense since by letter dated April 18, 1966, Lifson on behalf of Continental made a written confirmation of the transaction within a reasonable time, which was sufficient to bind Continental. The writing was received by Sprague in due course and Sprague did not make any objection thereto within ten days after the receipt of the letter.

Plaintiff has made numerous attempts to sell its machinery, but having failed in its efforts, now seeks a $20,000. judgment. That amount must be reduced by $600. Burton Lifson testified that it would have cost that much to ship the equipment and to provide instruction on its use.

■ Plaintiff also seeks storage charges of $20. a month and interest at 6%. Both will be awarded and calculated from the date suit was instituted. That date is used because interest was not expressly provided for in the agreement, and there is no other clear indication of a demand: See Arcuri v. Weiss, 198 Pa.Super. 608, 184 A.2d 24 (1962). Since suit was instituted on September 15, 1967, storage charges of $910. and interest of $4,413.50 will be assessed against the defendant.

## ORDER

And now, this 30th day of June 1971, it is ordered that judgment be entered on behalf of plaintiff, Continental Wirt Electronics Corporation and against defendant, Sprague Electric Company, in the amount of $24,723.50.

2. In Sprague's supplemental brief, it concedes that it falls under the definition of the term "merchant" as used in the Uniform Commercial Code.