LINCOLN PULP & PAPER CO.,
INC., Plaintiff,

v.

DRAVO CORPORATION, Defendant and
Third-Party Plaintiff,

v.

BABCOCK & WILCOX COMPANY, Koppers Company, and Whiting Corporation, Third-Party Defendants.

Civ. No. 74-65 ND.

United States District Court,
D. Maine, N. D.

Aug. 11, 1977.

508

Arnold L. Veague, Bernard J. Kubetz, Bangor, Maine, Manly Fleischmann, William L. D. Barrett, Caroline M. Martin, Charles T. Lee, New York City, for plaintiff.

Ralph I. Lancaster, Ernest J. Babcock, Jotham D. Pierce, Jr., Howard H. Dana, Jr., John W. Philbrick, Portland, Maine, Gene Carter, Paul W. Chaiken, Bangor, Maine, Gerald F. Petruccelli, Thomas A. Cox, Portland, Maine, Allan Tupper Brown, Washington, D.C., Richard J. Relyea, Bangor, Maine, Robert W. Poore, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER OF THE COURT

GIGNOUX, District Judge.

At the third-party preliminary trial, which was held on June 8 and 9, 1977, defendant and third-party plaintiff Dravo Corporation (Dravo) and third-party defendants Babcock & Wilcox Company (B & W), Koppers Company (Koppers) and Whiting Corporation (Whiting) presented evidence on the composition of their respective contracts for the sale by the third-party defendants and for the purchase by Dravo of equipment to be installed at the Lincoln, Maine pulp mill of plaintiff Lincoln Pulp & Paper Co., Inc. (Lincoln). Pursuant to the Court's orders of July 19 and November 19, 1976, the issues tried in each instance were: (1) whether the contract in question contains clauses purporting to disclaim certain warranties and to relieve the third-party defendant of liability for consequential damages, and (2) if such clauses are included in the contract, their meaning and effect. At the conclusion of the preliminary trial, the Court announced from the bench its ruling with respect to the Dravo-Koppers and Dravo-Whiting contracts but reserved its ruling with respect to the Dravo-B & W contract.

The Court having now considered the evidence presented by the parties and the written and oral arguments of counsel, this memorandum contains the Court's findings of fact and conclusions of law with respect to the Dravo-B & W contract, as required by Fed.R.Civ.P. 52(a).

## I.

### Findings of Fact

B & W was Dravo's only bidder for the heat and chemical recovery boiler required under the primary Lincoln-Dravo contract. In response to Dravo's inquiry, B & W submitted to Dravo on December 8, 1969 its first Proposal # P3–7742, for a 350-ton heat and chemical recovery boiler. This proposal contained both technical specifications and included B & W's General Terms and Conditions. By telegram on July 27, 1970, Dravo requested that B & W submit a revised proposal, incorporating Lincoln's changed technical requirements. B & W responded by letter of July 27, 1970. The letter quoted firm prices for the boiler and additional items of equipment; stated that the proposal was "firm for acceptance by August 15, 1970"; noted that the proposal was subject to prior sale of shop space; and further stated that if a letter of intent to purchase the equipment was received from Dravo by August 15, B & W could commence preparation of drawings and other contract work for a period of 30 days, subject to an extension of an additional 30 days, if Dravo agreed to substantial cancellation charges.

On August 7, 1970, B & W submitted to Dravo its revised Proposal, # P8–6533C, dated April 20, 1970 with pages revised to August 25, 1970. The cover letter specifically noted a change in one of B & W's proposed commercial terms, the warranty on defective material. The August 7 letter also offered to provide Dravo first opportunity at B & W's shop space until August 12, 1970.

The "General Conditions" of the August 7 proposal contained the protective clauses which B & W asserts are part of its contract with Dravo. The section entitled "Warranty and Limitation of Liability of Company [B & W]" reads in relevant part:

WARRANTY. The COMPANY shall repair or shall replace on an installed basis, any parts of said equipment which within one year from the date of initial operation are found to be defective in design, workmanship, material (if material, in case of delayed or postponed erection, is protected from damaging agents) or erection (if erected by the COMPANY), provided said equipment is operated by the PURCHASER [Dravo] in accordance with generally approved practice and in accordance with the conditions of service, if any, herein specified and provided the PURCHASER notifies the COMPANY in writing as soon as such defect becomes apparent. . . . No warranty, not expressly stated, other than title, shall be

implied from the manufacture, sale, furnishing, or erection of any of the said equipment to be furnished hereunder.

. . . . .

THE COMPANY AND PURCHASER AGREE THAT IN CONSIDERATION OF THE ABOVE EXPRESS WARRANTY THAT ALL OTHER WARRANTIES OTHER THAN TITLE EITHER EXPRESSED OR IMPLIED, WHETHER ARISING UNDER LAW OR EQUITY, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXCLUDED FROM THIS CONTRACT.

The liability of the COMPANY arising out of the manufacture, sale, furnishing, or erection of the equipment hereunder or its use, whether on warranties or otherwise, shall be limited to cost of repair or replacement of defective parts as herein specified.

A separate paragraph is headed "Consequential Damages" and reads in full:

The COMPANY shall not be liable in any event for loss of anticipated profits, loss by reason of plant shutdown, non-operation or increased expense of operation of other equipment, or other consequential loss or damage of any nature arising from any cause whatsoever.

The proposal further stated that the prices and terms were subject to acceptance within 60 days. Finally, it contained an integration clause providing that the proposal constituted the entire agreement between the parties and that a contract would be formed when the proposal had been accepted by Dravo and approved in writing by a B & W officer. The blank signature blocks on the proposal's final page, designated for these latter purposes, were never executed by either a Dravo representative or an officer of B & W. The final sentence of the integration clause reads:

Any provisions of a purchase order or specification which may be issued after this Proposal has been accepted by the PURCHASER and which are additions to or are in conflict with the provisions of this Proposal shall not be binding upon the COMPANY unless duly approved in writing by both parties to the Contract.

Following receipt by Dravo of the B & W revised proposal, D. B. Malcom, Dravo's Process Engineer, forwarded to R. L. Quasey, Dravo's Purchasing Agent, on August 11, 1970 an internal Dravo requisition order asking that a "cancellable Purchase Order" be issued to B & W "for one Chemical Recovery Unit in accordance with B & W Proposal No. P8–6533C dated April 20, 1970 (with pages revised to April 23 [sic], 1970) and Dravo Spec M–933–CF–1." The order requested that reference be made to the B & W letters of July 27 and August 7, 1970; emphasized that "this cancellable purchase order must be placed by August 12, 1970" in order to retain delivery of the equipment; and instructed that "[g]uarantees, warranties, inspections etc. to be per B & W proposals. . . ."[1]

On August 12, 1970 W. E. Crawford, Jr., Dravo's Purchasing Engineer, forwarded to A. G. Thompson, B & W's Sales Engineer, Dravo's letter of intent. The letter stated that it was a "memorandum of the discussion" held between the parties. It further recited that Dravo proposed to purchase and B & W proposed to sell a heat and chemical recovery unit on a firm price basis totaling $904,197.00, less $17,303.00 for the deletion of two tertiary burners, and that Dravo desired to retain an option to purchase several additional pieces of equipment and "start-up service" at fixed prices. The text of the final page of the letter of intent reads in full:

The following conditions to apply;

1. Work on this purchase order is to commence immediately. Should it be necessary to cancel this purchase or-

---

1. By letter of August 10, 1970, L. L. Gardner, Dravo's Assistant Purchasing Agent, forwarded the terms of a liquidated damages clause which Dravo requested be included in the agreement. B & W accepted this modification of its propos-

al in a letter dated August 25, 1970 signed by A. G. Thompson, its Sales Engineer. The liquidated damages clause was incorporated by reference in Dravo's August 12, 1970 letter of intent, *infra*.

der, Dravo Corporation will reimburse Babcock & Wilcox Company for any cancellation charges incurred as follows:

$17,000.00 maximum for the first thirty (30) days and $10,000.00 maximum for the second thirty (30) days.

2. Terms of payment to be as stated by you, your letter of July 27, 1970.

3. Shipment of drums would leave your shop September 3, 1971 and the balance of pressure parts and items would be shipped in an orderly sequence and be completed by December 3, 1971.

4. Liquidated damages as discussed and approved in our meeting will be made a part of the purchase order.

5. You are to forward to us promptly information regarding shipment of the equipment to enable us to formulate erection criteria.

A formal purchase order will be issued in the near future confirming this letter of intent.[2]

Thompson acknowledged Dravo's order by letter of August 19, 1970, noting that B & W had already assigned a contract number to the Order.

Dravo's purchase order was not soon forthcoming. The primary Lincoln-Dravo contract had been signed and placed in escrow on December 9, 1970 while Lincoln awaited completion of its financing arrangements. B & W proceeded initially with only the engineering aspects of the recovery boiler in an attempt to keep its costs at a minimum. By the end of October, however, B & W was involved in engineering, ordering material and releasing it for fabrication. During the latter part of 1970 Thompson had to continually press Dravo for either a complete release of the job or increases in the cancellation charges, as costs were mounting. He twice threatened to discontinue work unless Dravo authorized B & W to incur additional ex-

penses. By mid-November B & W was quoting, at Dravo's request, total cancellation charges of $203,000.00 as of February 5, 1971. By letter of December 22, 1970, Crawford promised to advise B & W by January 4 or 5, 1971 "whether to continue or stop all work on this project." January, however, witnessed yet another extension and increase in the limitation of expenditures. On January 28, 1971 T. D. Lipsey, B & W's Midwest Manager for Pulp and Paper Industry Sales, informed Crawford that the contract "must be completely released by February 5, 1971" and that cancellation after that date would result in B & W's recovery of all direct costs, overhead, and its entire anticipated profit. B & W and Dravo agreed, however, in early February to increased cancellation charges of $380,-000.00 through March 5, 1971. In a letter dated February 8, 1971 confirming their understanding, Quasey stated that "[i]t is understood that in view of Dravo's guarantee for such charges in lieu of a release that the order remains in tact [sic] and delivery and total contract price remains unchanged."

On February 15, 1971 Dravo's formal purchase order, confirming the August 12, 1970 letter of intent, was finally issued. As previously agreed by the parties, the purchase order authorized work by B & W only until March 5, 1971. The order stated on the front that "[a]ll purchases are subject to the conditions on the reverse side," and printed on the back of the first page were numerous conditions, including an indemnification and save harmless clause, which reads in relevant part:

You shall indemnify and save us harmless from any and all liability, expenses, costs, damages and/or losses of any kind arising out of injuries to any person or persons (including death) or damage to any property of any kind in connection with your performance hereunder.

The final printed paragraph on the reverse side reads:

condition of a limitation of expenditures. He further testified that if Dravo lifted this limitation, B & W would be obligated to fully perform and could not back out of the agreement.

2. Martin C. Roach, Dravo's Assistant Purchasing Agent for construction, who was Dravo's principal witness, characterized this letter of intent as a purchase order subject to the single

Conditions stated herein are exclusive of all others and shall take precedence over any conditions heretofore or hereafter originated by you.

Dravo's February 15 purchase order was forwarded to B & W's home office in Barberton, Ohio for review and "formal acceptance." On March 8, 1971 Alteration Number 2 to the purchase order released the job and authorized B & W to proceed with procurement, fabrication and delivery of the recovery boiler. Noted on the release in capital letters was the statement "[a]ll other terms and conditions to remain as previously specified."

On March 22, 1971 Donald R. Wilson, Executive Assistant and Manager of Central Contracts for B & W's Power Generation Division, signed the pink acknowledgement copy of Dravo's purchase order. An asterisk next to Wilson's signature referenced a red ink stamp which read "Accepted in accordance with the accompanying letter dated _____." On March 23, 1971 S. E. Haddad, of B & W's I &· M Commercial Department, wrote Lipsey and instructed him to accept the Dravo purchase order as qualified by the conditions set forth in Haddad's letter. Lipsey complied and on March 29, 1971 forwarded the signed pink acknowledgement copy with a cover letter accepting Dravo's purchase order subject to the exceptions taken therein. B & W's first objection reads:

> The conditions on the reverse side of the order have not been considered and, therefore, are not applicable in this contract.

B & W also set forth the language of its proposal "Warranty," *supra*, that had been eliminated by Dravo and stated that:

> The above referenced proposal P8–6533C is included, with our exceptions and comments herein, as part of the contract and shall govern in the event of conflict with other contract documents.

The final paragraph advised Dravo that "We are performing in accordance with the above. If this is not acceptable we must be advised immediately."

The parties have stipulated, and Dravo has admitted, that the March 29 letter was received by Dravo; distributed to at least Charles E. Bruder, Crawford, J. Jacobs, J. Szolis, and Roach; and reviewed and discussed at least by Bruder and Crawford. Although Roach testified that he instructed Crawford to respond to the letter, the parties have also stipulated that, except for subsequent alterations to the purchase order, at no time did Dravo or any of its employees indicate in writing or otherwise to B & W that it opposed any of the terms, conditions or provisions set forth in the March 29 letter written by Lipsey.[3] Subsequent alterations to the purchase order were signed and acknowledged by B & W and accepted in accordance with the March 29 letter. Dravo also admits that it did not provide B & W notice of its commercial terms until the February 15, 1971 purchase order.

Finally, Dravo and B & W have stipulated that:

> It is an almost universal custom and practice among buyers and sellers of major industrial equipment and of construction services relating thereto that contracts between the parties contain provisions disclaiming implied warranties and insulating sellers against liability for consequential damages and lost profits arising under or in connection with the performance of such contracts.

## II.

### Conclusions of Law

Dravo contends that no contract existed until March 1971 when B & W conditionally accepted Dravo's formal purchase order of February 15, 1971. In the alternative, Dravo argues that even if a contract arose prior to March 1971, either there was no agreement between the parties on the commercial terms of that contract until March 1971, or no agreement was ever achieved on these terms and the contract must be sup-

---

**3.** Wilson testified that if B & W had received an unacceptable response it would have immediately ceased work on the contract until the problem had been resolved.

plemented by the standard terms as set forth in the Uniform Commercial Code. B & W contends that a contract was formed in August 1970 and that the contract consists of its offer made on or before August 7, 1970, which is comprised of B & W's letters of July 27 and August 7, 1970 and the revised B & W Proposal P8–6533C, and Dravo's acceptance of that offer by its letter of intent dated August 12, 1970.

## A. *Preliminary*

The parties agree that the issues of contract formation and interpretation are governed by the Maine Uniform Commercial Code, 11 M.R.S.A. § 1–101 *et seq., see* 11 M.R.S.A. § 1–105(1). In any event, the Code has been adopted in all states having any significant relationship with the contract, and the parties further agree that the resolution of the issues presently before the Court does not depend upon which jurisdiction's law is applied.

## B. *B & W's Protective Clauses as Set Forth in its August 1970 Proposal P8–6533C, are Part of its Contract with Dravo*

Although the primary issue before the Court is essentially one of contract formation, the case does not involve the proverbial "battle of the forms." It is clear from the exchange of documents in July and August 1970, the subsequent conduct of the parties, the evidence of their intent at the time, and the applicable trade usage that a contract for the sale of a heat and chemical recovery unit was entered into by B & W and Dravo in August 1970. Furthermore, the commercial terms and conditions as set forth in B & W's proposal, including the disclaimer of warranties, limitation of liability to repair or replacement of defective equipment and limitation of liability for consequential damages are included in that contract.

**4.** As the Code has been adopted in all jurisdictions having contact with the agreement, subsequent citations will be to the Code rather than the Maine Statutes.

**5.** Dravo's failure to respond to B & W's proposal on the form provided is not dispositive of Dravo's acceptance of that proposal. Section

## (1) *A Contract was Formed in August 1970*

Section 2–204(1) of the Uniform Commercial Code, 11 M.R.S.A. § 2–204(1),[4] provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." B & W's letter of July 27, 1970 indicated that the terms of the proposal and the price of the boiler unit were firm until August 15, 1970 and invited a letter of intent from Dravo so that drawings and "other contract work" could begin. The August 7 letter, accompanying B & W's revised Proposal, notified Dravo that shop space was being held open for its order until August 12, and, furthermore, notified Dravo that one of its commercial terms, the disclaimer of warranty provision, had been modified. This latter information put Dravo on notice that B & W considered its commercial terms an integral part of its offer to sell the boiler unit as set forth in its proposal. Dravo recognized the importance of a prompt reply, as evidenced by the internal requisition instructing that an order be placed by August 12, 1970 to ensure delivery of the equipment.

It is within this context that Dravo's response to B & W through its August 12, 1970 letter of intent must be examined. The letter of intent contained an order for specific equipment and set forth the quantity, price, terms of payment, a shipping schedule, liquidated damages, and an authorization to begin work "immediately" subject only to cancellation charges. Under the Code no more is necessary to establish an agreement for the sale of goods. *Continental-Wirt Electronics Corp. v. Sprague Electric Co.*, 329 F.Supp. 959, 964 (E.D.Pa. 1951).[5] B & W's performance was not restricted to "engineering only" pending is-

2–206(1)(a) of the Code provides in relevant part:
(1) Unless otherwise unambiguously indicated by the language or circumstances,
(a) an offer to make a contract shall be construed as inviting acceptance in any manner

suance of a formal purchase order by Dravo. No mention was made of future negotiations. Dravo retained its contractual right to cancel, subject to an agreed schedule of cancellation charges should it exercise that right. B & W agreed to accept the risk of cancellation for a substantial fee. B & W's continued willingness to accept this risk, in exchange for substantial increases in the cancellation charges, totaling $380,000 by March 1971, does not negate the agreement formed between the parties in August that the heat and chemical recovery unit be manufactured by B & W for Dravo.

Moreover, Dravo's sole witness at the evidentiary hearing, Martin C. Roach, testified that his understanding of the letter of intent was that B & W was obligated to fully perform once Dravo lifted the ceiling on expenditures. He stated that Dravo's unilateral decision to do so would have prevented B & W from "backing out" of the agreement. Roach's understanding is borne out by subsequent events. The formal purchase order issued by Dravo on February 15, 1971 is essentially identical to the operative understanding of the parties at that time. It authorized B & W to proceed on the job until March 5, 1971, as already agreed by the parties, and when Alteration No. 2 finally released the contract on March 8, there is no question that B & W was bound to perform.

Dravo's August 12, 1970 letter of intent clearly stated sufficient terms to form the basis of a contract, and the actions of the parties evidence their understanding at the time that a binding agreement was entered into. The Court concludes that a contract was formed between B & W and Dravo in August 1970. The contract consists of B & W's offer, which is comprised of its letters of July 27 and August 7, 1970 and its revised Proposal P8–6533C, and Dravo's acceptance of that offer by its letter of intent dated August 12, 1970.

and by any medium reasonable in the circumstances. B & W's proposal did not indicate that indorsement of the form was the *sole* means of acceptance.

(2) *B & W's Disclaimer of Warranties, Limitation of Liability to Repair or Replacement, and Limitation of Liability for Consequential Damages are Part of the Contract*

Dravo contends that even if a contract existed as of August 1970 its own commercial terms apply to that contract or, in the alternative, that no agreement was reached on commercial terms and that the contract must therefore be supplemented by the Code. Both arguments must be rejected, as Dravo accepted the commercial terms contained in B & W's proposal through its August 12, 1970 letter of intent.

Roach testified that Dravo intended that its general conditions were to govern any agreement between the parties resulting from the August 12 letter of intent. He explained that Dravo's internal requisition for the letter of intent, which directed that "guarantees, warranties, inspections etc. to be per B & W proposals," referred only to the technical aspects of the job. He further stated that the August 12 letter was intended to accept only the technical aspects, including performance guarantees and warranties, of B & W's proposal, but not to accept the proposal's commercial terms. This finely drawn distinction finds no support whatsoever in either the language of the letter or the subsequent conduct of the parties. It is also patently incredible that Dravo could believe its commercial terms governed an agreement when it admits that B & W was never furnished a copy of Dravo's commercial terms or notified that Dravo would insist upon its own terms until six months later when the formal purchase order was issued.[6] The only terms known to both parties at the time of agreement were those set forth in B & W's proposal, to which Dravo's attention had been drawn by

6. While Roach testified that Dravo's usual policy was to send its commercial terms out with the initial bid inquiry, Dravo admits that they were not sent to B & W and, further, that they did not accompany Dravo's final technical specifications sent to B & W in September 1970.

B & W's letter of August 7, 1970 and to which Dravo did not object in its acceptance.

Dravo also contends that its repeated references to the promised purchase order constituted notice that it would insist on its own commercial terms. Merely stating that a confirming purchase order will be issued in the future, however, neither puts the other party to a contract on notice that the terms of that purchase order will control nor incorporates those undisclosed terms in the contract. *See* 3 *Corbin on Contracts*, § 538 at 57–58 (1960). *Cf. Belanger & Sons, Inc. v. United States*, 275 F.2d 372 (1st Cir. 1960); *Tri-City Concrete Co. v. A.L.A. Construction Co.*, 343 Mass. 425, 427, 179 N.E.2d 319, 320 (1962).[7] Dravo was aware of the need to establish certain commercial terms prior to entering into an agreement with B & W, as is evidenced by its insistence upon the liquidated damages provision which was negotiated and included by reference in the letter of intent.

Finally, as this contract is governed by the Uniform Commercial Code, evidence of trade usage may both aid in the interpretation of the contract and supplement the terms thereof. Section 1–201(3) of the Code provides in relevant part:

(3) "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act . . . .

Section 1–205(2) provides:

A usage of trade is any practice or method of dealing having such a regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

Dravo has stipulated to the relevant trade usage, as follows:

It is an almost universal custom and practice among buyers and sellers of major industrial equipment and of construction services relating thereto that contracts between the parties contain provisions disclaiming implied warranties and insulating sellers against liability for consequential damages and lost profits arising under or in connection with the performance of such contracts.

Dravo's admission as to the relevant usage and its failure to object to B & W's proposed conditions substantially undermine its argument that the commercial terms of the agreement between the parties exclude B & W's protective clauses.

The Court concludes that the disclaimer of warranties, limitation of liability to repair or replacement of defective equipment, and limitation of liability for consequential damages as set forth in B & W's Proposal P8–6533C are part of the contract between Dravo and B & W. The Court further concludes that the commercial terms of the contract were not altered in February 1971, when Dravo attempted to modify the contract through the inclusion of its own commercial terms in the February 15, 1971 confirming purchase order. As B & W objected in writing within a reasonable time to any modifications of the existing contractual provisions, *see* UCC 2–207(2)(c), Dravo did not carry its statutory burden and its attempt to modify the contract failed.

C. *Meaning and Effect of the Disclaimer of Warranties and Consequential Damages Clauses*

(1) *The Warranty Clause*

■ The warranty clause of the contract, which is set forth above, includes an express warranty guaranteeing the equipment supplied for one year from the date of initial operation. This express warranty

---

7. *Southeastern Enameling Corp. v. General Bronze Corp.*, 434 F.2d 330 (5th Cir. 1970), cited by Dravo in support of its position that references to a forthcoming purchase order show that the order constitutes the "closing document", is distinguishable on several grounds. First, contract formation in *South-eastern Enameling* was governed by Alabama common law and not the Code. Second, the seller had signed an identical purchase order containing the disputed terms one month earlier. Finally, the seller admitted never having read the terms which it accepted and later sought to avoid.

limits B & W's liability, however, to repair or replacement of any defective parts within the warranty period. The Uniform Commercial Code permits such a limitation or remedy. Section 2–719(1)(a) provides in full:

> The agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts.

B & W has therefore effectively limited its liability for breach of its express warranty to repair or replacement.

■ The warranty clause of the contract also excludes all implied warranties. The Uniform Commercial Code permits the contractual exclusion of implied warranties, provided the disclaimer is in writing and conspicuous. In the case of an implied warranty of merchantability, the language attempting to exclude such a warranty must expressly refer to merchantability. Section 2–316(2) of the Code provides in full:

> Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in the case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."[8]

The disclaimer of implied warranties in the warranty clause of the contract fulfills all these statutory criteria. B & W has therefore effectively disclaimed all implied warranties.

### (2) The Consequential Damages Clause

■ The Code allows the parties to a contract to limit or exclude consequential damages. Section 2–719(3) provides in full:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

*See also* Section 2–316(4).[9] Dravo has admitted that B & W's consequential damages clause is not unconscionable. *See* Section 2–719(3), Official Comment.

The consequential damages clause in the Dravo-B & W contract reads in full:

> The COMPANY shall not be liable in any event for loss of anticipated profits, loss by reason of plant shutdown, nonoperation or increased expense of operation of other equipment, or other consequential loss or damage of any nature arising from any cause whatsoever.

This contractual provision clearly excludes liability for consequential damages arising from breach of contract or breach of warranty. *See Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.*, 436 F.Supp. 262 (1977), Part II(B). The Court also concludes that the clause is sufficiently clear to protect B & W from liability for consequential damages arising from its own negligence.

The parties agree that the law of the State of Maine controls the interpretation of this clause and further agree that Maine has not yet considered the precise language

---

**8.** The Code also permits an implied warranty to be "excluded or modified by course of dealing or course of performance or usage of trade." Section 2–316(3)(c). As the disclaimer presently before the Court is in writing, it is not necessary to resort to trade usage. The Court does note, however, that the parties have stipulated that it is an almost universal custom and practice within the industry that similar contracts contain provisions disclaiming implied warranties.

**9.** Section 2–316(4) provides:

Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2–718 and 2–719).

in a commercial contract necessary to insulate a party from consequential damages arising from its own negligence. *See idem,* Part II(C). The Court need not, however, attempt to anticipate the standard that Maine would adopt, as even under the most stringent standard of "clear and unequivocal", as that phrase is interpreted by Pennsylvania courts, *idem,* the language of the clause as supplemented by the relevant trade usage, *see* UCC §§ 1–201(3), 1–205(2), *supra,* effectively excludes liability for consequential damages arising from B & W's own negligence. *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 756 (3rd Cir. 1976).

The clause explicitly states that B & W shall not be liable "in any event" for consequential damages "of any nature arising from any cause whatsoever." Moreover, Dravo has stipulated that the trade custom among buyers and sellers of major industrial equipment is that contracts between such parties contain provisions "insulating sellers against liability for consequential damages and lost profits *arising under or in connection with the performance of such contracts.*" (emphasis supplied) Donald Wilson testified on behalf of B & W, without contradiction, that persons knowledgeable in the purchase and sale of heavy industrial equipment would read the clause as protecting against liability for negligence.

Dravo's position on this issue has consistently been that B & W's clause provides protection to the same extent that the limitation of liability clause in the Lincoln-Dravo contract protects Dravo from consequential damages as against Lincoln. *See Lincoln Pulp & Paper Co., Inc. v. Dravo Corp., supra.* This argument ignores the crucial differences between the two contractual provisions. First, the language of the B & W clause is broader in scope than that of Dravo. Second, the present contract is governed by the Code, which permits a party to be bound by trade usage of which he should be aware even if the parties did not explicitly or expressly negotiate a particular clause. *Posttape Associates v. Eastman Kodak Co., supra.* The Lincoln-Dravo contract is governed by the common law of Pennsylvania. Finally, while the Court does not determine the standard that Maine would apply, as it finds that the clause in question is sufficient under the strict Pennsylvania rule, nothing in Maine commercial law indicates that Maine would adopt this stringent common law standard in interpreting the Code. *See, e.g., Gates Rubber Co. v. USM Corp.,* 508 F.2d 603 (7th Cir. 1975); *Boone Valley Cooperative Processing Ass'n v. French Oil Mill Machinery Co.,* 383 F.Supp. 606 (N.D.Iowa 1974). For all of these reasons, Dravo's position must be rejected.

### III.

#### Summary

In accordance with the foregoing, the Court holds:

(1) That the contract between Dravo and B & W is B & W's revised Proposal P8–6533C, together with B & W's letters of July 27 and August 7, 1970, as accepted by Dravo's letter of intent dated August 12, 1970;

(2) That the protective clauses asserted by B & W are part of its contract with Dravo;

(3) That the warranty clause in the contract effectively disclaims all implied warranties and limits Dravo's remedy for breach of contract or breach of express warranty to the cost of repair or replacement of defective equipment;

(4) That the consequential damages clause in the contract protects B & W from liability for consequential damages, whether arising from breach of contract, breach of warranty or its own negligence.[10]

IT IS SO ORDERED.

---

**10.** A separate contract for the erection of the heat and chemical recovery boiler at Lincoln, Maine was entered into by Dravo and B & W on June 21, 1971. Dravo has conceded that this contract contained a disclaimer of consequential damages and has further stipulated and admitted that its intent and understanding was that the language set forth in this protec-

tive clause "would protect B & W against claims for consequential damages and lost profits, whether arising from breach of contract, breach of express or implied warranties, or negligence in the performance of the contract resulting from the acceptance of the purchase order." As this intent was clearly shared by B & W, and the language of the clause supports such an understanding, no issue remains for resolution by the Court at this time with regard to the erection contract.