398 A.2d 695

**INDUSTRIAL MOLDED PLASTIC PRODUCTS, INC., Appellant,**

**v.**

**J. GROSS & SON, INC.**

**INDUSTRIAL MOLDED PLASTIC PRODUCTS, INC.**

**v.**

**J. GROSS & SON, INC., Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 5, 1978.

Decided Feb. 23, 1979.

516

James D. Crawford and Eugene A. Spector, Philadelphia, for appellant at No. 643 and appellee at No. 667.

Alan C. Gershenson, Philadelphia, for appellant at No. 667 and appellee at No. 643.

Before CERCONE, HESTER and HOFFMAN, JJ.

HOFFMAN, Judge:

This is a breach of contract action brought by Industrial Molded Plastic Products, Inc. (Industrial) against J. Gross & Son, Inc. (Gross). In a non-jury trial below, the court awarded Industrial $2,494.52 damages representing lost profits. Industrial now contends that the proper measure of damages was the contract price of the goods. Gross has cross-appealed on the issue of liability, contending that the salesman who signed the contract lacked the authority to bind the corporate entity.

Industrial is in the business of manufacturing custom injection molded plastics by specification for various manufacturers. Industrial also manufactures various "fill-in" items during slack periods, such as electronic parts, industrial components, mirror clips, and plastic clothing clips. Industrial manufactured plastic clothing clips only for its house accounts of H. Daroff & Sons and Joseph H. Cohen & Sons. Gross is a wholesaler to the retail clothing industry, selling mostly sewing thread, but also other items such as zippers, snaps, and clips. Gross sold only a small amount of plastic clothing clips, never having more than $100–$200 worth of clips in inventory at any one time.

Sometime in the Fall of 1970, Mr. Stanley Waxman (Gross' President and sole stockholder) and his son Peter (a 22 year old salesman for Gross) appeared at the offices of Industrial's President, Mr. Judson T. Ulansey. They suggested to him that they might be able to market Industrial's plastic clothing clips in the retail clothing industry, in which they had an established sales force. At this initial meeting, there was no discussion of Peter Waxman's authority or lack thereof in the company. After this meeting, Stanley authorized Peter to purchase a "trial" amount of clips (not further specified) to test the market, but neither this authorization nor its limitation was communicated to Ulansey. All subsequent negotiations were between Ulansey and Peter Waxman only. Deceiving both his father and Ulansey, Peter

held himself out as Vice-President of Gross, and on December 10, 1970, signed an agreement obligating Gross to purchase from Industrial five million plastic clothing clips during the calendar year of 1971, at a price of $7.50 per thousand units, delivery at Industrial's plant in Blooming Glen, Pennsylvania. Gross was granted an exclusive distributorship in the clips for the same time, excepting Industrial's two house accounts mentioned above. Before the execution of this agreement, Ulansey telephoned Stanley Waxman, who told Ulansey that Peter could act on behalf of Gross. There was no discussion of the specific terms of the agreement, such as the quantity purchased.

Industrial immediately began production of the five million clips during "fill-in" time. As they were manufactured, they were warehoused in Industrial's plant as per the contract. In February, 1971, Peter Waxman picked up and paid for 772,000 clips. Stanley Waxman, who had to sign Gross' check for payment, thought that this was the "trial amount" he had authorized Peter to buy. These were the only clips which Gross ever took into its possession. On numerous occasions during the year Ulansey urged Peter to pick up more of the clips, which were taking up more and more storage space at Industrial's plant as they were being manufactured. Peter told Ulansey that he was having difficulty selling the clips and that Gross had no warehousing capacity for the inventory that was being accumulated. At no time, however, did Peter repudiate the contract or request Industrial to halt production. By the end of 1971, production was completed and Industrial was warehousing 4,228,000 clips at its plant.

On January 19, 1972, Industrial sent Gross an invoice for the remaining clips of $31,710, less credit of $203.55, for a balance due of $31,506.45. However, Gross did not honor the invoice or pick up any more of the clips. Ulansey wrote to Stanley Waxman on February 7, 1972, requesting him to pick up the clips. Receiving no response, Ulansey wrote to Stanley Waxman again on February 23, 1972, threatening legal action if shipping instructions were not received by

March 1, 1972. Finally, on March 30, 1972, Peter Waxman responded with a letter to Ulansey, which stated that Gross' failure to move the clips was due to a substantial decline in the clothing industry in 1971 and competition with new lower-cost methods of hanging and shipping clothes. The letter asked for Industrial's patience and predicted that it would take at least the rest of the year to market the clips successfully. At this point, Industrial initiated legal action. Stanley Waxman learned of the five million clip contract for the first time when informed by his lawyer of the impending law suit. Industrial filed its complaint in August of 1972, and at the same time Peter began an extended (four years) leave of absence from Gross.

Ulansey testified that Industrial was unable to resell any of the 4.2 million clips because of a lack of market generally. Additionally, Industrial lost its two house accounts for plastic clothing clips because Daroff went bankrupt and Cohen refused to do further business with Industrial, citing a close personal relationship with Stanley Waxman. Industrial, being a manufacturer, had no sales force to find new customers. However, Industrial did receive a small quantity of new orders from 1972 to 1976, for which new clips were manufactured.

Gross contends that it was not bound by the agreement to purchase the clips because Peter Waxman had no authority to sign the contract for Gross. However, Peter was an agent of Gross and did have *express* authority to purchase for Gross, as its President instructed him to purchase a "trial amount" of clips. A principal's limitation of his agent's authority in amount only, not communicated to the third party with whom the agent deals, does not so limit the principal's liability. *Zager v. Gubernick,* 205 Pa.Super. 168, 172, 208 A.2d 45 (1965); *Young & Co., Inc. v. Heinz,* 94 Pa.Super. 95, 99–100 (1928). "Although the agent violates his instructions or exceeds the limits set to his authority, he will yet bind his principal to such third persons, if his acts are within the scope of the authority which the principal has caused or permitted him to possess. . . . Such limita-

tions . . . will be as binding [on the] conclusive upon third persons *who know of them* . . . ." *Edwards v. Heralds of Liberty,* 263 Pa. 548, 552, 107 A. 324, 325 (1919).

An admitted agent is presumed to be acting within the scope of his authority where the act is legal and the third party has no notice of the agent's limitation. *Continental-Wirt Electron Corp. v. Sprague Electric Co.,* 329 F.Supp. 959, 963 (E.D.Pa.1971). The third person must use reasonable diligence to ascertain the authority of the agent, *Fishman v. Davidson,* 369 Pa. 39, 44, 85 A.2d 34, 37 (1951), but he is also entitled to rely upon the apparent authority of the agent when this is a reasonable interpretation of the manifestations of the principal. *Turnway Corp. v. Soffer,* 461 Pa. 447, 458, 336 A.2d 871 (1975); *Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 375, 246 A.2d 407, 410 (1968).

Here, the limitation on Peter's authority was not communicated to Industrial. As Stanley Waxman brought Peter into the initial meeting soliciting business from Industrial, Ulansey could reasonably presume his authority to act for Gross in consummating the deal. Gross complains that Ulansey was not diligent in ascertaining Peter's authority, but in fact Ulansey telephoned Stanley Waxman precisely for the purpose of verifying Peter's authority. As Stanley said that Peter was authorized to act on behalf of Gross, the principal thus completed clothing the agent in apparent authority to bind the corporate entity on the agreement. If anybody was lacking in diligence, it was Stanley Waxman in not inquiring as to the amount of the contract Peter proposed to sign. Thus, we affirm the conclusion of the court below that Gross was bound by the agreement to purchase the clips.

Industrial contends that the court below erred in entering judgment based upon its lost profits, on the grounds that the proper measure of damages was the unpaid balance of the contract price. The court below limited damages to lost profits because it found in fact that Industrial "did not make a good faith or reasonable effort to resell the goods

. . . nor did he demonstrate the futility of any resale attempt."

It is true that in order to maintain an action for the contract price of goods which are merely *identified*, the seller must mitigate damages or show that such effort would be unavailing. Uniform Commercial Code, 12A P.S. § 2–709(1)(b). However, a seller of goods is also entitled to recover the contract price due for goods *accepted* by the buyer. 12A P.S. § 2–709(1)(a). Under the Code, a buyer's acceptance of goods occurs, *inter alia*, when, after a reasonable opportunity to inspect the goods, the buyer fails to make an effective rejection of them. 12A P.S. § 2–606(1)(b). To preserve his rights, the seller is only obligated to tender the goods in accordance with the terms of the contract. 12A P.S. § 2–507(1). The seller is under no obligation to resell accepted goods in order to maintain his action for price. 12A P.S. § 2709(1)(a). *See generally Unlaub Co., Inc. v. Sexton*, 568 F.2d 72, 76–77 (8th Cir. 1977).

■■ Here, Industrial wholly performed its obligations under the contract, manufacturing five million clips [1] and delivering them to its plant in Blooming Glen, Pennsylvania. For over a year, Industrial entreatied Gross to take possession of the growing pile of clips. Thus, Gross had ample opportunity to inspect, but never rejected the goods. In fact, even as late as March 30, 1972, Gross still indicated that it intended to market the clips, but would need more time to do so. As such, Gross accepted the clips and breached its contract by failure to pay for them. Since the goods were accepted, Industrial is entitled to the full unpaid balance of

1. Gross contends that Section 2–709(1)(a) is not available to Industrial because of a lack of proof that the 4,228,000 clips were in fact manufactured. Industrial introduced, without objection, an invoice for this amount. While cross-examining the witness thirty pages later in the transcribed notes of testimony, Gross' counsel moved to strike the invoice on the grounds that it was hearsay and not properly qualified as a business record, 28 P.S. § 91b. The motion was denied. However, by failure to make a timely objection Gross has waived this issue. *See Jones v. Spidle*, 446 Pa. 103, 107, 286 A.2d 366, 367 (1971) (motion to strike made during cross-examination insufficient to preserve issue).

the contract price, notwithstanding its failure to attempt to resell the clips.

The order below is reversed and the court below is directed to enter judgment in favor of Industrial against Gross for $31,506.45, plus interest from January 19, 1972.

CERCONE, President Judge, concurs in result.